IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01180-CMA-MEH

JAIME FUENTES, individually and on behalf of others similarly situated,

        Plaintiffs,

v.

COMPADRES, INC., d/b/a Tequila's (Golden),
TEQUILAS THORNTON NUMBER 6, LLC, d/b/a Tequila's (Thornton),
TEQUILAS OF THORNTON, LLC d/b/a Tequila's (Thornton),
EL AGAVE AZUL, INC. d/b/a El Tequileno (Arvada),
EL NOPAL, INC. d/b/a El Tequileno (Lakewood),
EL TEQUILENO #1 d/b/a El Tequileno (Aurora),
JOSE RAIGOZA DeJESUS GARCIA, and
RODRIGO SANCHEZ,

        Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Jaime Fuentes, on behalf of himself and others similarly situated ("Plaintiff"), initiated this action on May 12, 2017 and filed the operative Second Amended Complaint on September 15, 2017 alleging, *inter alia*, that the Tequila Defendants[1] and the Tequileno Defendants,[2] which are restaurants and alleged owners/managers of the restaurants, failed to pay the proper overtime rate for hours over 40 worked in the workweek, retained tips for management, failed to provide adequate notice related to the tip credit, and over-reported his tips on paystubs in violation

---

[1]The "Tequila Defendants" are Compadres Inc., Tequilas Thornton Number 6, LLC, Tequilas of Thornton, LLC, and Jose Raigoza DeJesus Garcia.

[2]The "Tequileno Defendants" are El Agave Azul, Inc., El Nopal, Inc., El Tequileno #1, and Rodrigo Sanchez.

of the Fair Labor Standards Act ("FLSA") and the Colorado Wage Claim Act ("CWCA").  Each set

of Defendants filed a motion to dismiss all claims against them.  The Court finds that the Plaintiff's

state law claims against the individual Defendants must be dismissed, but none of the other

arguments proffered by the Defendants support dismissal at this stage of the litigation and, thus, the

Court recommends that the Honorable Christine M. Arguello grant in part and deny in part the

Defendants' motions.

## BACKGROUND

### I.   Statement of Facts

The following are factual allegations (as opposed to legal conclusions, bare assertions, or

merely conclusory allegations) made by the Plaintiff in the Second Amended Complaint, which are

taken as true only for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).

Plaintiff worked for Tequila's Family Mexican Restaurant as a waiter/bartender from

October 24, 2016 to February 22, 2017.  For the first couple of months, Plaintiff worked at the

Thornton location, then for the next two months he worked at the Golden location.  Regardless of

the location, Plaintiff Fuentes' paycheck included the same notation at the top: "Tequila's Family

Mexican Restaurants, 17535 S Golden Road Golden, CO 80401-2635."

Both the Thornton and Golden locations used the same kind of point-of-sale ("POS") system

for clocking in and out and placing customers' orders. The menus at the two restaurants were the

same. The logo and signs at the two restaurants looked the same.  Further, regardless of the location,

Plaintiff was required to wear the same uniform, a long sleeved grey shirt with the Tequila's logo

on it.

Plaintiff's manager in Golden, "Alejandro," worked at Thornton as a server with Plaintiff. Plaintiff knows other people who worked at Thornton and who started working at Golden when it reopened. Additionally, he knows other servers who had worked at various Tequila's Family Mexican Restaurant locations.

In addition to waiting tables, Plaintiff was tasked with "side work" such as loading ice into the soda machine, making iced tea, slicing lemons, stocking the salt and pepper racks, cleaning the tables and floors, writing the daily lunch specials for customers, and rolling silverware.  In his position, Plaintiff regularly interacted with customers who were from all across the United States. He handled food and other supplies that originated outside of Colorado, and he utilized Defendants' credit card machine to process payments.

When he worked in Thornton, Plaintiff estimates that, on average, he worked 45 hours per week.  In Golden, Plaintiff estimates that he worked 55 hours per week for the first three weeks after the location opened, after which he worked about 45 hours per week.  Plaintiff usually worked six days per week, or every day of the week except Tuesday, and he almost always worked both the lunch and dinner shifts. Generally, Plaintiff started work around 10:00 a.m. before the restaurants opened for customers at 10:45 a.m. in Golden or 11:00 a.m. in Thornton.  Then, Plaintiff would clock out in the middle of the afternoon, for approximately two-to-three hours, between  2:00 p.m. and 5:00 p.m.  The restaurants both closed at 11:00 p.m. on Fridays and Saturdays and at 10:00 p.m. during the remaining days of the week. Plaintiff would generally clock out at closing time, unless there were any guests remaining in his section.  In such circumstances, he clocked out shortly after the last customer left, typically twenty-to-thirty minutes after closing time.

For the biweekly pay period ending December 31, 2016, Plaintiff's paystub indicates that

he

worked more than eighty-six hours at the Golden location. Thus, in at least one of the two weeks

constituting that pay period he worked more than forty hours per week.  He also worked "off the

clock," meaning the Defendants required Plaintiff to perform work before clocking in and/or after

clocking out. Specifically, Defendants regularly required Plaintiff to clock out, then perform the

"side work" and cleaning activities, which took approximately twenty-to-thirty minutes per day to

perform.  Defendants did not pay Plaintiff for this time in wages, nor did he receive any tips related

to this time.  For almost every shift he worked at Golden, Plaintiff's manager, Alejandro, required

him to clock out, then perform cleaning activities. When he worked at Thornton under a different

manager, such requirement happened less frequently, but still occurred approximately two-to-three

times per week.

      In this position, Plaintiff's pay scheme was sub-minimum wage plus tips.  In 2016 (and the

first pay period of 2017), his regular hourly rate was $5.28 per hour and his overtime rate was $7.92

per hour. Thereafter in 2017, his hourly wage rate was $6.28 per hour and the overtime rate was

$9.14 per hour.  Thus, Plaintiff was paid an incorrect rate for all hours over 40 worked in a

workweek.

      Plaintiff, like others similarly situated, was never informed about or provided notice of any

tip credit claimed by the Defendants.  Even though customers would regularly leave tips on credit

cards, tips were only ever paid to servers, including Plaintiff, in cash at the end of the shift, not by

paychecks.  On the pay stubs, all the tips were reported as cash tips.  Management retained tips

intended for Plaintiff and others similarly situated.  At some point when he was working at Golden,

Plaintiff realized that the amount of tips reported on his paystubs was more than he actually

received. In around mid-February 2017, he complained to Defendant Garcia about the over-reporting of his tips. Approximately one week later, the manager, Alejandro, accused Plaintiff of stealing tequila and fired him.

## II.    Procedural History

Based on these factual allegations, Plaintiff claims on behalf of himself and other similarly situated willful violations of the FLSA including minimum wage violations; failures to compute overtime properly for sub-minimum wage tipped workers; and incorrect payment of overtime and minimum wages due to incorrect accounting of hours worked. Am. Compl., ECF No. 63. Plaintiff also claims violations of the CWCA, including failures to pay minimum wages and weekly overtime premiums; improper payment of tips, failure to pay wages when due, failure to pay all earned wages, failure to properly keep records, and willful failure to respond to a wage demand. *Id.*

Both the Tequila Defendants and the Tequileno Defendants responded to the operative pleading by filing motions to dismiss arguing that, since Plaintiff was not employed by some of the Defendants, he had no standing to bring claims against them and the Court lacks subject matter jurisdiction to hear such claims. In addition, the Defendants contend that Plaintiff fails to state plausible claims under the FLSA and CWCA, and the individual Defendants are not liable under the CWCA.

Plaintiff counters that, even were he not employed by some Defendants, his allegations plausibly demonstrate that all Defendants are liable under the FLSA and CWCA as a "single employer" or "single enterprise," which is a theory different than the "joint employer" doctrine applied by the Defendants. Further, Plaintiff contends that for collective (or class) action complaints such as that here, courts have historically found that a plaintiff need not "determine conclusively"

which of the defendant companies was his or her employer at the pleading stage.  Plaintiff also contends that the individuals are properly named as Defendants under the FLSA and CWCA, FLSA coverage questions are not proper for Rule 12 analysis, and Plaintiff's allegations are sufficient to demonstrate plausible overtime claims, improper retention of tips, and record-keeping failures. Finally, Plaintiff asks that, should the Court determine his allegations are insufficient, he be granted leave to file a third amended complaint.

Defendants reply[3] that they are separately owned and, thus, do not meet the definition of a "single enterprise"; Plaintiff fails to establish an employee-employer relationship with certain Defendants; Plaintiff fails to properly rebut Defendants' argument that his allegations do not demonstrate enterprise coverage; Plaintiff should not be granted leave to amend for the fourth time; Plaintiff's allegations are insufficient to state claims for overtime and improper retention of tips; and Plaintiff cannot sue an individual under the CWA.

## LEGAL STANDARDS

Defendants contend this Court lacks subject matter jurisdiction over Plaintiff's claims pursuant to Fed. R. Civ. P. 12(b)(1) and, otherwise, they argue Plaintiff fails to state claims for relief pursuant to Fed. R. Civ. P. 12(b)(6).

## I.    Dismissal under Fed. R. Civ. P. 12(b)(1)

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of subject matter jurisdiction."  Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case,

---

[3]The Tequila Defendants contend that Plaintiff's response brief should not be considered for violations of Judge Arguello's practice standards for font and page length.  However, the Tequila Defendants' motion also exceeds the required page length and Plaintiff responded to two motions, totaling thirty pages in length, in only eighteen-and-a-half pages.

but only a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013). A Rule 12(b)(1) motion to dismiss must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction. *Smith v. Plati*, 258 F.3d 1167, 1174 (10th Cir. 2001). The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Butler v. Kempthorne*, 532 F.3d 1108, 1110 (10th Cir. 2008). Accordingly, the Plaintiff in this case bears the burden of establishing that the Court has jurisdiction to hear his claims.

Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).

> First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. In reviewing a facial attack on the complaint, a district court must accept the allegations in the complaint as true.
>
> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Id.* at 1002–03 (citations omitted). The present motion launches a factual attack on this Court's subject matter jurisdiction; therefore, the Court will accept not the truthfulness of the Second Amended Complaint's factual allegations for its Rule 12(b)(1) analysis.

## II.     Dismissal Pursuant to Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 679-80.  Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008)).  "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011).  Thus, while Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

## ANALYSIS

At the outset, the Court recognizes the Tenth Circuit's admonition that "[f]ederal courts

'have an independent obligation to determine whether subject-matter jurisdiction exists . . . at any stage in the litigation.'" *Image Software, Inc. v. Reynolds & Reynolds Co.*, 459 F.3d 1044, 1048 (10th Cir. 2006) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006)). The Tequileno Defendants challenge whether this Court has subject matter jurisdiction to hear Plaintiff's claims by arguing primarily that Plaintiff had no employment relationship with them. The Tequila Defendants make this same argument regarding Tequilas of Thornton, LLC and, otherwise, contend Plaintiff fails to allege individual or enterprise coverage under the FLSA. The Court will begin with an analysis of the challenge to subject matter jurisdiction.

I. **Does an Employment Relationship under the FLSA Implicate the Court's Jurisdiction?**

It appears that the Tenth Circuit has not addressed whether the employment relationship under the FLSA is a jurisdictional question, but at least one court in this District has followed other district courts in finding that it is. *See Murphy v. Allstaff Med. Res., Inc.*, No. 16-cv-02370-WJM, 2017 WL 2224530, at *3 (D. Colo. May 22, 2017) ("The Court agrees with the proposition that existence of an employment relationship between or among the parties is a jurisdictional requirement under the FLSA.") (citing *Li v. Renewable Energy Solutions, Inc.*, No. 11-3589 (FLW), 2012 WL 589567, at *4–5 (D. N.J. Feb. 22, 2012)); *see also Doe I v. Four Bros. Pizza, Inc.*, No. 13 CV 1505 (VB), 2013 WL 6083414, at *5 (S.D. N.Y. Nov. 19, 2013) ("Unlike in *Arbaugh*, the FLSA's employer-relationship language appears in a statutory provision that plainly speaks in jurisdictional terms, by addressing the jurisdiction of the federal courts to hear claims arising under the FLSA.") (citing 29 U.S.C. § 216(b)); *White v. Classic Dining Acquisition Corp.*, No. 1:11-cv-712-JMS, 2012 WL 1252589, at *2 (S.D. Ind. Apr. 13, 2012) (finding a plaintiff, who was not an employee of twenty-six out of twenty-eight named defendants, had no standing to sue the twenty-six defendants).

In *Arbaugh*, the Supreme Court addressed whether Title VII's[4] limitation of covered employers to those with 15 or more employees affected subject-matter jurisdiction or was "simply an element of a plaintiff's claim for relief."  546 U.S. at 510–11.  The Court noted that "[s]ubject matter jurisdiction in federal-question cases is sometimes erroneously conflated with a plaintiff's need and ability to prove the defendant bound by the federal law asserted as the predicate for relief—a merits-related determination."  *Id.* at 511.  The Court concluded that the statutory limitation was *not* jurisdictional saying, "neither § 1331, nor Title VII's jurisdictional provision, 42 U.S.C. § 2000e–5(f)(3) (authorizing jurisdiction over actions 'brought under' Title VII), specifies any threshold ingredient akin to 28 U.S.C. § 1332's monetary floor. Instead, the 15–employee threshold appears in a separate provision that 'does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts.'"  *Id.* at 515 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)).  The Court's "bright line" rule—"when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character" (*id.*)—has been applied to determine the jurisdictional parameters of other federal statutes, including the FLSA.

For example, in *Gilbert v. Freshbikes, LLC*, 32 F. Supp. 3d 594, 600 (D. Md. 2014), the court addressed whether the defendant's contention that it was not an employer under either Title VII or the FLSA was "jurisdictional."  The *Gilbert* court looked at the definitions of "employer" and "employee" under the FLSA and applied *Arbaugh*'s "bright line" rule to conclude, "whether a defendant is an employer as defined by the FLSA is an element of the plaintiff's meritorious FLSA claim and does not implicate subject matter jurisdiction."  *Id.* at 601; *see also Chavez v. Montes*, 91

---

[4]Title VII of the Civil Rights Act of 1964, as amended.

F. Supp. 3d 1091, 1092 (W.D. Ark. 2015) ("the Court finds that the question of FLSA [enterprise] coverage is not a jurisdictional inquiry"); *Fuqua v. Celebrity Enters., Inc.*, No. 12-cv-00208-WJM, 2012 WL 4088857, at *2 (D. Colo. Sept. 17, 2012) (citing *Arbaugh* and finding, "the Supreme Court has held that definitional requirements in a statutory scheme—such as who is an 'employer' or 'employee'—are more properly considered an element of the offense rather than a jurisdictional issue."); *Rodriguez v. Diego's Rest., Inc.*, 619 F. Supp. 2d 1345, 1350 (S.D. Fla. 2009) ("This Court is persuaded by the reasoning in *Arbaugh* that the requirement that a plaintiff establish individual or enterprise coverage is not jurisdictional."). These latter cases (and others not cited here) make clear that questions of employee/employer *coverage* under the FLSA are not jurisdictional.

However, *Murphy* and related opinions conclude that the employment *relationship* is governed in the FLSA by § 216, which "uses the terms 'employee' and 'employer' throughout, refers to the employment relationship, and speaks in clear jurisdictional terms, stating that '[a]n action to recover [for] liability ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.'" *Id.* (citing 29 U.S.C. § 216(b)); *see also Four Bros. Pizza*, 2013 WL 6083414, at *5 ("Unlike in *Arbaugh*, the FLSA's employer–relationship language appears in a statutory provision that plainly speaks in jurisdictional terms, by addressing the jurisdiction of the federal courts to hear claims arising under the FLSA.").

Notably, in *Four Bros. Pizza* and *Li*, the courts determined whether an employee-employer relationship existed by examining the "economic realities" of such relationships. The Tenth Circuit, too, has used the "economic reality" test to examine whether a plaintiff is an employee under the FLSA. *See, e.g., Johnson v. Unified Gov't of Wyandotte Cnty.*, 371 F.3d 723, 729 (10th Cir. 2004);

11

*Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998); *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994).  However, while it was not asked to do so, in none of these cases did the Tenth Circuit characterize the existence of an employment relationship under the FLSA as jurisdictional.  In fact, in *Johnson*, the trial court sent the question of whether the plaintiffs were employees to the jury.  *Johnson*, 371 F.3d at 728–29.  Also, in approaching its analysis of the issue, the *Johnson* court stated, "As applied to the plaintiffs in this case *and their relationship to the defendants*, the FLSA generally defines an employee as 'any individual employed by a ... political subdivision of a State ....' 29 U.S.C. § 203(e)(1)." *Id.* at 729 (emphasis added).  Thus, it is unclear whether the Tenth Circuit, faced with the question whether an employment relationship under the FLSA is jurisdictional, would answer affirmatively.

More recently, the Seventh Circuit followed the analysis of a District of Maryland case finding, in response to a standing inquiry, that "[u]nder the FLSA, alleged employees' 'injuries are only traceable to, and redressable by, those who employed them.'" *Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016) (quoting *Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 412 (D. Md. 2013)).  Without further analysis, the court determined that the plaintiffs' "connection to the other schools and the NCAA is far too tenuous to be considered an employment relationship" and concluded the plaintiffs lacked standing to sue any defendant other than their undisputed employer.  *Id.*

Notably, *Roman* appears to be contrary to *Gilbert*, *supra*, both of which originate from the District of Maryland and were issued by the same judge.  In both cases, certain defendants filed motions to dismiss for lack of subject matter jurisdiction arguing they were not the plaintiffs' employers.  *See Roman*, 970 F. Supp. 2d at 411–12 ("Defendants contend that Plaintiffs have failed

12

to establish subject matter jurisdiction because their complaint fails sufficiently to allege that Defendants were Plaintiffs' 'employer' for purposes of the FLSA"); *Gilbert*, 32 F. Supp. 3d at 600 ("Defendants assert that they were not Plaintiff's employer under either Title VII or the FLSA, and the court assumes that this is the basis for their subject matter challenge."). In *Roman*, issued September 6, 2013, the court granted the motion to dismiss finding that the plaintiffs lacked standing to bring a putative collective action against restaurants at which they were not employed because they failed to demonstrate "the required employer-employee relationship necessary to establish that their injuries [were] fairly traceable to the Corporate Defendants, [ ]or that a favorable decision against the Corporate Defendants would redress Plaintiffs' alleged injuries." 970 F. Supp. 2d at 415–16. Conversely, in *Gilbert* issued July 9, 2014, the court found that "whether a defendant is an employer as defined by the FLSA is an element of the plaintiff's meritorious FLSA claim and does not implicate subject matter jurisdiction." 32 F. Supp. 3d at 601.[5] In light of this incongruity and the Seventh Circuit's lack of analysis on the issue, the Court is not inclined to recommend following the opinions in *Berger* and *Roman*.[6]

The Court concludes that, without clear direction from the Tenth Circuit as to whether an employee-employer relationship under the FLSA is a jurisdictional question, as well as the Tenth

---

[5]The Court recognizes that *Roman* involves a putative collective action while *Gilbert* involves a single plaintiff; however, this appears to be a distinction without a difference where there is no indication in either opinion that the court has taken the type of claim under consideration for purposes of the present analysis. *See also* 29 U.S.C. § 216(b) (providing private right of action for individuals *and* putative collective action members).

[6]With this said, the Court acknowledges that the Tenth Circuit could reasonably determine, like the Seventh Circuit, that the question involves a plaintiff's standing and whether he or she can demonstrate an employment relationship pursuant to the joint employer doctrine, single employer doctrine, or economic realities test such as in *Roman*, 970 F. Supp. 2d at 413 and in *Crumbling v. Miyabi Murrells Inlet, LLC*, 192 F. Supp.3d 640, 644–45 (D. S.C. 2016).

Circuit's past opinions demonstrating the court has not historically considered the question to be jurisdictional in nature, this Court respectfully declines to follow the unpublished opinions in *Murphy*, *Li*, and *Four Bros. Pizza*, and recommends that Judge Arguello refuse the Defendants' invitation to analyze the issue wholly pursuant to Rule 12(b)(1).

## II.      Do the Allegations Plausibly State Plaintiff is an Employee of Defendants?

Defendant Tequilas of Thornton LLC and the Tequileno Defendants argue the Plaintiff is not, and never was, an employee of theirs and Plaintiff's allegations are insufficient to show employment relationships under either the joint employer doctrine or the economic realities test.  Plaintiff counters that his allegations are indeed sufficient to demonstrate employment relationships with the Tequileno Defendants and Tequilas of Thornton, not under the "joint employer" doctrine,[7] but under a "single employer" theory.

### A.      Application of the Single Employer Theory

The Tenth Circuit has articulated the difference between the "joint employer" and "single employer" doctrines as follows: "Although these two tests are sometimes confused, they differ in that the single-employer test asks whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities."  *Bristol v. Bd. of Cnty. Comm'rs of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002) (applying tests for analysis of claims under the Americans with Disabilities Act).

---

[7]Plaintiff specifically declines to argue the "joint employer" theory saying, "Defendants improperly conflate the concepts of several Defendants' inclusion as part of the 'enterprise' or 'single employer' versus an *additional*, separate employer or 'joint employer.' These are different concepts, and must be analyzed as such. . . . Ultimately, Plaintiff is arguing that the related entities constitute a single 'unit' for purposes relevant to the applicable wage laws, and that that singular unit was what, as a matter of economic reality, was the 'employer' of the plaintiff and others similarly situated."  Resp. 6–7.

"[T]he single employer test focuses on the relationship between the potential employers themselves." *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1227 (10th Cir. 2014) (applying tests for analysis of gender discrimination claim pursuant to Title VII). "Courts applying the single-employer test generally weigh four factors: '(1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control.'" *Id.* (quoting *Bristol*, 312 F.3d at 1220). For purposes of finding shared liability, courts including the Tenth Circuit "generally consider the third factor—centralized control of labor relations—to be the most important." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1322 (10th Cir. 2004) (applying tests for analysis of gender, race, and national origin claims under Title VII).

Importantly, the Plaintiff has cited, and the Court has found, no Tenth Circuit opinion applying the single employer doctrine to determine whether an employment relationship exists under the FLSA. Courts agree that Title VII defines an "employer" quite differently than the FLSA defines the same term. *See, e.g., Salemi v. Colo. Pub. Emps. Ret. Ass'n*, 176 F. Supp. 3d 1132, 1158 (D. Colo. 2016); *see also Saavedra v. Lowe's Home Ctrs., Inc.*, 748 F. Supp. 2d 1273, 1283 (D. N.M. 2010). However, without recognizing any difference between Title VII and the FLSA, at least one district court in the Tenth Circuit has cited *Bristol* and applied its single employer test, including the four factors, to determine whether the addition of certain defendants to an FLSA complaint would be futile under Rule 12(b)(6). *See Creech v. P.J. Wichita, LLC*, No. 16-2312-JAR-GEB, 2016 WL 4702376, at *3 (D. Kan. Sept. 8, 2016). The court found that the plaintiff's allegations of the "same office," "common ownership," and "shared policies" regarding pay were sufficient to demonstrate an employment relationship with the defendants necessary to state a plausible FLSA claim. *Id.*

In other circuits, courts have applied the "single employer" test to determine whether allegations are sufficient under the FLSA to impose liability and demonstrate employment relationships with defendants who do not employ the plaintiffs. For example, in *Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D. N.Y. 2014), the court applied the "'single integrated enterprise' test . . . to assess whether a group of distinct but closely affiliated entities should be treated as a single employer," and found the allegations sufficient to demonstrate "interrelated operations" and "centralized control of labor relations." *Id.*; *see also Davis v. Abington Memorial Hosp.*, 817 F. Supp. 2d 556, 564–65 (E.D. Pa. 2011) (applying the test and finding the plaintiffs' allegations insufficient to demonstrate not only a nominal defendant, but also any interrelation among the defendants); *Marsteller v. Butterfield 8 Stamford LLC*, No. 3:14-cv-1371 (AWT), 2017 WL 4286364, at *3 (D. Conn. Sept. 27, 2017) ("Courts have applied the four-factor [single employer] test for FLSA purposes.") (citing *Juarez* and other cases from the districts of New York); *Boddy v. Astec, Inc.*, No. 1:11-cv-123, 2012 WL 5507298, at *5 (E.D. Tenn. Nov. 13, 2012) (applying the test and finding no evidence of centralized control of labor relations); *Radford v. Telekenex, Inc.*, No. C10-812RAJ, 2011 WL 3563383, at *3 n.7 (W.D. Wash. Aug. 15, 2011) (recognizing that the test was "developed in the context of employment discrimination cases, not FLSA claims" but assuming without deciding that the test applied "in the FLSA context.").

Conversely, at least three other courts have determined the doctrine does not apply for analysis of whether a defendant is liable as an employer under the FLSA, but only for determining whether the "defendant is sufficiently large to be governed under the Act." *Joaquin v. Coliseum, Inc.*, No. A-15-CV-787-LY, 2016 WL 3906820, at *5 (W.D. Tex. July 13, 2016), *adopted by* 2016 WL 7647630 (Aug. 2, 2016) (citing *Lucas v. BMS Enters., Inc.*, No. 3:09-cv-2159-D, 2010 WL

2671305, at *3 n.8 (N.D. Tex. July 1, 2010) ("FLSA *liability* is predicated only on an employee-employer relationship, not on defendants' involvement in a common enterprise.")); *see also Barth v. Border Foods, Inc.*, No. 10-305 (PAM), 2012 WL 12895688, at *6 (D. Minn. Mar. 19, 2012) ("The integrated enterprise test [under which separate entities are considered to be a single employer] does not apply to the determination of whether [defendant] should be deemed Plaintiffs' employer under FLSA.").

One court appears to have recognized the different definitions of "employer" in Title VII and the FLSA for purposes of applying a "single employer" test.  In *Gilbert*, *supra*, the court applied the test (as set forth in *Bristol*) to determine whether the defendants were a single employer liable for the plaintiff's Title VII claims, then for the FLSA claims noted, "[t]he term 'employer' under the FLSA is generally 'interpreted broadly to achieve Congress's intent to provide a remedy to employees for their employers' wage and hour violations,'" and identified a *different* test for determining whether the defendants were liable under the FLSA as a single employer.  32 F. Supp. 3d at 603–04.  However, the cases from which *Gilbert* incorporated such test involve questions of coverage, rather than questions of liability.  *See Brock v. Hamad*, 867 F.2d 804, 806–07 (4th Cir. 1989); *Martin v. Deiriggi*, 985 F.2d 129, 133 (4th Cir. 1992).  The Court agrees with the majority of courts that the analyses of liability and coverage under the FLSA are different.  *See, e.g., Patel v. Wargo*, 803 F.2d 632, 635–36 (11th Cir. 1986); *Barth* , 2012 WL 12895688, at *6 ("Courts have generally recognized the material distinction between FLSA coverage and liability.") (collecting cases).

Again, without direction from the Tenth Circuit or any district courts within, and given the clear differences between the FLSA and other discrimination statutes, as well as the variance of

opinions finding either way, the Court recommends that Judge Arguello decline the Plaintiff's invitation to apply a "single employer" theory in his effort to demonstrate an employment relationship necessary to show the Tequileno Defendants and Tequila's of Thornton LLC are liable.

  B.     Application of the Economic Realities Test

  "Whether an employment relationship exists for the purposes of the FLSA turns on the 'economic reality' of the working relationship." *Saavedra*, 748 F. Supp. 2d at 1285 (citing *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961) and *Henderson*, 41 F.3d at 570).  Under the FLSA, an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee ...." 29 U.S.C. § 203(d). An "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The FLSA "defines the verb 'employ' expansively to mean, 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)).

  Plaintiff argues essentially that any analysis of whether an employment relationship exists between the Defendants and the Plaintiff (and others similarly situated) is premature and should not be undertaken until the "decertification" stage of this litigation.  Resp. 1–4.  Certainly, courts have determined—typically when addressing motions for conditional certification—that analyses of whether the plaintiffs are employees of the defendant(s) pursuant to the economic realities test should not occur until after a collective action has been conditionally certified.  *See Whitlow v. Crescent Consulting, LLC*, -- F.R.D. ---, 2017 WL 3484192, at *2–*3 (W.D. Okla. Aug. 14, 2017) ("The undersigned agrees with those courts that have concluded the ['fact intensive'] economic realities inquiry is appropriate at step two of the ad hoc approach, that is in addressing a motion for decertification.") (citing *Carter v. XPO Last Mile, Inc.*, 2016 WL 5680464, at *5 (N.D. Cal. Oct. 3,

18

2016)); *see also Hose v. Henry Indus., Inc.*, 49 F. Supp. 3d 906, 917 (D. Kan. 2014) (declining to engage in a "merits"-related economic realities analysis in resolving a motion for conditional certification); *Medrano v. Flowers Foods, Inc.*, No. 16-350-JCH, 2017 WL 3052493, at *3 (D. N.M. July 3, 2017) ("Any variation in the putative class members' job responsibilities [analyzed using the economic realities test] is a factor to be considered at the second stage of the analysis after completion of discovery."); *but see Bryant v. Act Fast Delivery of Colo., Inc.*, No. 14-cv-00870-MSK, 2015 WL 3929663, at *4 (D. Colo. June 25, 2015) (addressing the "threshhold issue" of whether the putative plaintiffs were actually the defendants' employees utilizing the economic realities test in analyzing a motion for conditional certification).

However, as Judge Martinez recently noted when addressing a motion to dismiss very similar to those brought here, "district courts within the Tenth Circuit, including Colorado, have applied the economic realities test at both the motion to dismiss and summary judgment phase[s]." *Schindler v. Whiting Petroleum Corp.*, No. 17-cv-01051-WJM, 2017 WL 5969814, at *3 (D. Colo. Dec. 1, 2017) (quoting *Coldwell v. Ritecorp Envtl. Prop. Sols.*, 2017 WL 1737715, at *5 (D. Colo. May 4, 2017)). Thus, the Court will proceed to address the Defendants' arguments in the present motions to dismiss.

In this case, the Plaintiff alleges that he worked at two locations of Tequila's Restaurant, the first in Thornton and the second in Golden, and asserts the following allegations, which may be pertinent to determine whether Plaintiff plausibly states employment relationships with the Tequileno Defendants and Tequila's of Thornton LLC:

> 12. ... there are or have been Tequila's Family Mexican Restaurants, some now known as El Tequileño's, located throughout Colorado including two locations in Grand Junction, and others in Arvada, Lakewood, Durango, Glenwood Springs, Aurora, Longmont, Evergreen, Cortez, Rifle, Pagosa Springs, Trinidad, and Bayfield.

19

There are also Tequila's restaurants out of state. . . .

13. By way of overview, the entities included herein at this time are a) Defendant Jose Garcia, b) Defendant Rodrigo Sanchez, and c) those Tequila's restaurant locations (in Colorado) with which Defendant Rodrigo Sanchez is or has ever been affiliated.   That list includes at least five locations: Golden, Thornton, Arvada, Lakewood, and Aurora.

* * *

18. Defendant Garcia began his Tequila's endeavors in Colorado by opening restaurants in Durango and Grand Junction in around 1999 or 2000. Thereafter, he opened additional locations in other towns across the state on average once every year or two, often in conjunction with family members.

19. Defendant Garcia has, or at times relevant to this action has had, an ownership interest in and/or is a shareholder of Compadre's, Inc. (Golden). Upon information and belief, he was 50% owner (with Defendant Sanchez owning the other 50%) and is now 100% owner.  Defendant Garcia is the registered agent for this entity.

20. Defendant Garcia has, or at times relevant to this action has had, an ownership interest in and/or is a member of Tequilas Thornton Number 6 (Thornton).  Upon information and belief, he at different times has been 100% owner and 50% owner. Defendant Garcia is also the registered agent for this entity.

21. Defendant Garcia has, or at times relevant to this action has had, an ownership interest in and/or is a member of Tequilas of Thornton LLC. Upon information and belief, he is 100% owner. Defendant Garcia is also the registered agent for this entity.

* * *

23. Defendant Garcia has actively participated in the business of the restaurants and has exercised substantial control over the functions of the company's employees including Plaintiff and others similarly situated.

24. For example, he hired [Plaintiff], set his rate of pay, had the authority to fire him, received a complaint from [Plaintiff] regarding there being more tips reported on his paystub than he was actually receiving, and oversaw the "day to day" restaurant managers.

* * *

29. Defendant [Rodrigo] Sanchez used to be a co-owner of the Tequila's location in

Golden along with Defendant Garcia.

30. This location burned down in approximately 2012, but did not reopen for several years.

31. In addition, Defendant Sanchez has also been a co-owner of the Tequila's location in Thornton along with Defendant Garcia, and upon information and belief, still is.

32. Tequilas of Thornton LLC is a delinquent corporation whose principal place of business is listed with the Colorado Department of State as being located at 224 Berthoud Way, Golden CO 80401, which is Sanchez's home address. Upon information and belief, this is or was a real estate holding company related to the Thornton location.

33. Regardless of his ownership of the Golden and Thornton restaurants, Defendant Sanchez serves and/or has served as a manager, general manager, or de facto director of operations of (inter alia) the Golden and Thornton Tequila's locations.

34. Serving in that role, he has been instrumental, though not solely responsible for, setting and executing on various pay-related policies.

35. In conjunction with a 2009 investigation relating to the Tequila's Golden location, the [U.S.] Department of Labor ["DOL"] found Defendant Sanchez, whom the DOL referred to as a "general manager" of the restaurant, to be an additional § 203(d) "employer" of the workers at issue, and found violations including failure to pay kitchen staff proper overtime pay. In addition, in conjunction with a 2013 investigation relating to the Tequila's Thornton location, the DOL found Defendant Sanchez, whom the DOL deemed to be serving as a "general manager" of the restaurant, to be an additional § 203(d) "employer" of the workers at issue, and again found several violations including failure to pay for all hours worked by employees, failure to pay overtime properly, and recordkeeping inadequacies. The Department of Labor found that he made daily business decisions, directed work and actively created policies relating to the interests of the restaurant employees.

36. The restaurant locations in Aurora, Lakewood, and Arvada used to be known as Tequila's but at some point (upon information and belief, in around 2014) were slightly rebranded to the El Tequileño name. Even so, publicly the Tequila's name is still used somewhat interchangeably with the El Tequileño name.

37. Upon information and belief, this rebranding effort was in conjunction with a shifting of ownership of these three locations from Garcia and Sanchez to Sanchez on his own.

Case 1:17-cv-01180-CMA-MEH   Document 114   Filed 12/12/17   USDC Colorado   Page 22 of 40

38. Defendant Garcia has an ownership or other financial interest in the Tequila's/Tequilenos locations in Aurora, Lakewood, and Arvada (the "El Tequileño restaurants").

39. Upon information and belief, he and his wife are currently co-owners of these locations.

\* \* \*

41. At all times material to this action, Defendant Sanchez actively participated in the business of the Tequila's restaurants in at least Golden, Thornton, Aurora, Lakewood, and Arvada and has exercised substantial control over the functions of the company's employees including Plaintiff Fuentes and others similarly situated. For example, in addition to having affiliation with setting policies and directing activities at the Golden and Thornton locations where Plaintiff Fuentes worked, he also hired workers, set their rates of pay, had the authority to fire them, and oversaw other "day to day" restaurant operations and management in all five locations.

Am. Compl., ECF No. 63. The Tenth Circuit has not addressed directly the standard(s) by which a district court must, under the FLSA, analyze an employment relationship involving multiple employers. However, in *Fernandez v. Mora-San Miguel Elec. Co-op, Inc.*, 462 F.3d 1244, 1248 (10th Cir. 2006), the court addressed whether one of several defendants, a polygraph examining company, was an "employer" under the Employee Polygraph Protection Act (EPPA), which the court found had the same definition of "employer" as the FLSA. *Id.* ("Given Congress's use of the same language in defining the term 'employer' in the two statutes, and because we agree with the reasoning of other courts that have adopted this test, we approve using the economic reality test in evaluating whether a polygraph examiner is an 'employer' for purposes of EPPA."). Following a Fifth Circuit opinion, the Tenth Circuit proceeded to examine whether the company was an employer utilizing factors specific to the EPPA. *Id.* (quoting *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 727 (5th Cir. 2002)).

Courts within the Tenth Circuit and, particularly, this District have applied the economic

realities test to determine whether a company is the plaintiff's employer under the FLSA. *See, e.g., Schindler*, 2017 WL 5969814 at *3–*4 (in a purported collective action, the court found the plaintiff plausibly pled allegations demonstrating the defendant was an employer under the FLSA); *Beltran v. InterExchange, Inc.*, 176 F. Supp. 3d 1066, 1079–80 (D. Colo. 2012) (the court adopted the magistrate judge's application of the economic realities test and recommendation that the plaintiffs stated a plausible claim that fifteen defendant "visa sponsors" were employers under the FLSA); *Harbert v. Healthcare Servs. Grp., Inc.*, 173 F. Supp. 2d 1101, 1105 (D. Colo. 2001) (in determining whether defendant was an employer under the FMLA, the court recognized the definition tracked that in the FLSA and stated, "[i]n the Tenth Circuit, whether one is an employer under the FLSA is determined by applying an 'economic realities' test."). These and other opinions convince this Court that application of the economic realities test under the circumstances presented here is proper.

The Tenth Circuit has instructed:

> In applying the economic reality test, courts generally look at (1) the degree of control exerted by the alleged employer over the worker; (2) the worker's opportunity for profit or loss; (3) the worker's investment in the business; (4) the permanence of the working relationship; (5) the degree of skill required to perform the work; and (6) the extent to which the work is an integral part of the alleged employer's business. *Henderson*, 41 F.3d at 570. In deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work. Second, drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors set out above. Finally, employing the findings with respect to the six factors, the court must decide, as a matter of law, whether the individual is an "employee" under the FLSA. *Id.* at 571. None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach. *Id.* at 570.

*Baker*, 137 F.3d at 1440–41. *Baker*'s analysis has been utilized by some district courts in this circuit when determining whether a joint employer relationship exists. *See, e.g., Matrai v. DirecTV, LLC,*

168 F. Supp. 3d 1347, 1353 (D. Kan. 2016); *Beltran*, 176 F. Supp. 3d at 1079.   This Court has previously recognized that when the Tenth Circuit declined to address how the "joint employer" doctrine should be analyzed, the court essentially distinguished between an employee/independent contractor analysis and a joint employer analysis and, thus, demonstrated that not all factors set forth in *Baker* may be relevant for application.   *See Johnson v. Unified Gov't of Wyandotte Cnty.*, 371 F.3d 723, 728–29 (10th Cir. 2004).

At least one district court in this Circuit has recognized (indirectly) such distinction when noting that "[b]ecause the inquiry in this case is one of joint employer status rather than employee status, the factors applied in those cases [including *Baker* and *Johnson*] are not directly applicable." *Zachary v. Rescare Okla., Inc.*, 471 F. Supp. 2d 1175, 1179 (N.D. Okla. 2006) (citing *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 67–68 (2d Cir. 2003)) (noting that factors such as those considered in *Henderson* and *Johnson*, including the workers' investment in the business and the degree of skill and independent initiative required of workers, are used primarily to distinguish independent contractors from employees and therefore "do not bear directly on whether workers who are already employed by a primary employer are also employed by a second employer").   In *Zachary*, the court listed four factors "most commonly applied" in this context—whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, or (4) maintained employment records.   *Id.* (citing *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983)).   In fact, the Tenth Circuit cited these same "factors" in its application of the economic realities test.   *Baker*, 137 F.3d at 1440 ("The economic reality test includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls

employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records.") (citing *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir.1990)).

With these legal principles in mind, the Court agrees that certain of the *Baker* factors are not, or may not be, applicable here and will proceed to consider any factors that reasonably apply to the circumstances presented while employing a totality-of-the-circumstances approach. *Id.* at 1440–41.

First, taking the Plaintiff's allegations as true, the Court finds the Plaintiff has plausibly alleged that Defendant Sanchez, as a manager and co-owner of the restaurants at which Plaintiff worked, had the power to hire and fire Plaintiff, supervised and controlled Plaintiff's work schedule, determined Plaintiff's rate and method of payment, and maintained Plaintiff's employment records. Am. Compl. ¶¶ 29, 31, 33, 35, and 41. The Court respectfully recommends that Judge Arguello find Plaintiff has plausibly alleged Sanchez is an "employer" under the FLSA and deny the Tequileno Defendants' motion in this regard. *See Saavedra*, 748 F. Supp. 2d at 1288 ("Corporate officers who have a substantial ownership interest in the corporation, and who are directly involved in decisions affecting employee compensation, may be held personally liable under the FLSA").

Second, the Court finds the Plaintiff has stated plausible allegations demonstrating the El Tequileno restaurants in Arvada, Lakewood, and Aurora, had the power to hire and fire persons similarly situated to him, determined their rate and method of payment, supervised and controlled their work schedules and/or employment conditions, and maintained their employment records. Plaintiff alleges the putative plaintiffs are "similarly situated, in that they have been subject to common pay practices and decisions on the part of the Defendants" and the "claims of the Named Plaintiff alleged herein are essentially the same as those of the other FLSA Collective Plaintiffs."

Am. Compl. ¶ 77; *see also Bryant*, 2015 WL 3929663 at *4 (requiring that the plaintiffs allege the potential opt-in plaintiffs were similarly situated to themselves with regard to the circumstances of their working conditions); *Schindler*, 2017 WL 5969814 at *4 (recognizing that allegations regarding "putative class members" were "relevant to the economic realities test").  In addition, the Plaintiff alleges that Defendants Garcia and Sanchez, co-owners and/or managers of these restaurants, "exercised substantial control over the functions of the company's employees including Plaintiff and others similarly situated" including hiring, firing, setting rates of pay, and implementing company policies.  Am. Compl. ¶¶ 23, 24, 41.  The Court recommends that Judge Arguello find Plaintiff has plausibly alleged the El Tequileno restaurants in Arvada, Lakewood, and Aurora are "employers" under the FLSA and deny the Tequileno Defendants' motion in this respect.

Third, although a close question considering the allegation that it is a "real estate holding company," the Plaintiff has plausibly alleged Tequila's of Thornton LLC, which is owned by both Sanchez and Garcia, directly affiliated with the Thornton restaurant at which Plaintiff worked, and located at Sanchez' place of residence, served to supervise and control the Plaintiff's employment conditions.  Am. Compl. ¶¶ 32–35, 41; *see also Koellhoffer v. Plotke-Giordani*, 858 F. Supp. 2d 1181, 1190 (D. Colo. 2012) ("the overaching concern is whether the [defendant] 'possessed the power to control' Plaintiff and the other employees") (quoting *Herman v. RSR Security Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)); *Harbert*, 173 F. Supp. 2d at 1106 (an entity may constitute an "employer" under the FLSA if it "possesse[s] sufficient indicia of control.").  Taking the allegations as true at this early stage of the litigation, the Court recommends that Judge Arguello find Tequila's

of Thornton LLC[8] is an employer under the FLSA and deny its motion to dismiss in this regard.  *See*
29 U.S.C. § 203(d) (an employer is "any person acting directly or indirectly in the interest of an
employer in relation to an employee ....").

In sum, the Court respectfully recommends that Judge Arguello deny the present motions
finding that Plaintiff has plausibly alleged employment relationships with the Tequlieno Defendants
and Tequila's of Thornton, LLC.

### III.    Do the Plaintiff's Allegations Plausibly State Individual and/or Enterprise Coverage under the FLSA?

The FLSA requires payment of minimum wages and overtime (time and a half of regular
pay) for certain employees who work more than forty hours per week and who are "engaged in
commerce...or...employed in an enterprise engaged in commerce." 29 U.S.C. §§ 206(a), 207(a)(1);
*see also Daley v. Alpine Urology, P.C.*, No. 15-cv-00228-CMA, 2016 WL 1460306, at *2 (D. Colo.
Apr. 13, 2016) (citing *Reagor v. Okmulgee Cty. Family Res. Ctr.*, 501 F. App'x 805, 808 (10th Cir.
2012)).  Thus, "[e]mployment may be covered under the [FLSA] pursuant to either 'individual' or
'enterprise' coverage." *Id.* (quoting *Tony and Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290,
295 n.8 (1985)).

The FLSA defines "enterprise engaged in commerce" as an enterprise that "has employees
engaged in commerce or...that has employees handling, selling, or otherwise working on goods or
materials that have been moved in or produced for commerce by any person" and "is an enterprise
whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of
excise taxes at the retail level that are separately stated)."  29 U.S.C. § 203(s)(1)(A).  In addition,

---

[8]The Court has found no binding or persuasive case analyzing (under the economic
realities test) whether a real estate holding company is an "employer" under the FLSA.

the FLSA requires that an employee be "engaged in commerce." 29 U.S.C. § 203(s)(1)(A). "The Tenth Circuit has interpreted this to mean that the employee 'must directly participate in the actual movement of persons or things in interstate commerce.'" *Daley*, 2016 WL 1460306 at *2 (quoting *Reagor*, 501 F. App'x at 809). To be eligible for individual coverage under the FLSA, the employee "must either work for a transportation or communication industry employer or regularly and recurrently use an instrument of interstate commerce, such as a telephone." *Id.*

For both enterprise and individual coverage, the FLSA defines "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." *Id.* (quoting 29 U.S.C. § 203(b)). "In assessing individual and enterprise coverage, Congress intends to 'regulate only activities constituting interstate commerce, not activities merely affecting commerce.'" *Id.* (quoting *Reagor*, 501 F. App'x at 809). In addition, "[p]ractical considerations guide when determining what constitutes commerce or engaging in commerce." *Id.*

Defendants contend the Plaintiff fails to plausibly allege that either he or they are "covered" under 29 U.S.C. §§ 206(a), 207(a)(1). Plaintiff counters that "FLSA coverage questions are not proper for the Rule 12 context," particularly Rule 12(b)(1), and that he alleged sufficient "coverage" allegations in his original Complaint, but they were "inadvertently deleted in the First and Second Amended Complaints." Resp. 15–16. Plaintiff also points to several paragraphs in the operative pleading demonstrating a "common sense" interpretation of coverage under the FLSA.

As set forth above, the Court agrees with Plaintiff that coverage questions are not jurisdictional but, rather, are elements of a plaintiff's FLSA claim. *See Murphy*, 2017 WL 2224530 at *4 ("after *Arbaugh*, district courts have repeatedly held that the FLSA's coverage requirements,

like those at issue here, are nonjurisdictional"). However, although Plaintiff may have "inadvertently" omitted allegations concerning coverage under the FLSA in the operative pleading, "[a]n amended complaint supersedes the original complaint and renders the original complaint of no legal effect." *See Franklin v. Kan. Dep't of Corrs.*, 160 F. App'x 730, 734 (10th Cir. 2005) (citing *Miller v. Glanz*, 948 F. 2d 1562, 1565 (10th Cir. 1991)). Thus, the Court must review the allegations of the operative pleading to determine whether Plaintiff plausibly states allegations demonstrating he and the Defendants are covered under the FLSA.

Regarding enterprise coverage, Plaintiff alleges that "Tequila's Family Mexican Restaurants" for which the Plaintiff and putative class members worked, includes locations outside of Colorado, (Am. Compl. ¶¶ 8, 12), such as in Wenatchee, Washington (¶ 17). However, Defendant Garcia is the "founder of the Tequila's Family Mexican Restaurant enterprise *in Colorado*" (¶¶ 16, 49 (emphasis added)) and Defendant Sanchez is an owner and co-owner with Garcia of restaurants *in Colorado* (¶¶ 31, 37, 38). Nevertheless, the allegations reflect that the Defendants are restaurants and restaurant owners/managers who "ha[ve] employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" pursuant to 29 U.S.C. § 203(s)(1)(A). *See* Am. Compl. ¶¶ 23, 33, 43–48. That is, Plaintiff and the putative collective action members (i.e., employees of Defendants) "handled food and other supplies that originated outside of Colorado, and [ ] utilized Defendants' credit card machine to process payments." *Id.* The Court finds these allegations sufficient to plausibly state the Plaintiff and putative members were "engaged in commerce" pursuant to 29 U.S.C. § 203(s)(1)(A). *See Perez v. ZL Rest. Corp.*, 81 F. Supp. 3d 1062, 1068, 1072–73 (D. N.M. 2014) (adopting the Department of Labor's finding that the defendant restaurant employees, who "handl[ed] and process[ed] credit

29

card transactions" and "placed orders that traveled in interstate commerce with the restaurant's suppliers," were engaged in commerce under the FLSA).

The Plaintiff must also allege that the Defendants are "an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A). The FLSA defines the term "enterprise" as "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or organizational units." 29 U.S.C. § 203(r)(1). Based on this definition, the following three elements must coexist before Defendants' restaurants fall within the Act's coverage: (1) related activities; (2) performed through unified operations or common control; and (3) for a common business purpose. *Wirtz v. First Nat. Bank & Trust Co.*, 365 F.2d 641, 643 (10th Cir. 1966).; *Darling v. Frank*, 125 F.3d 861, 1997 WL 633962, at *2 (10th Cir. Oct. 15, 1997) (citing *Brennan v. Arnheim & Neely, Inc.*, 410 U.S. 512, 518 (1973)). After a review of the allegations set forth above, the Court has no trouble finding that Plaintiff has plausibly alleged the Defendants constitute an "enterprise" for the purpose of demonstrating coverage under the FLSA. Am. Compl. ¶¶ 8–12, 43–51.

Moreover, although the Plaintiff does not expressly allege that the enterprise's "annual gross volume of sales made or business done is not less than $500,000," the allegations reflect that Defendants make up five restaurants located in the Denver metro area in operation at all times relevant to the operative pleading, and which "have common ownership and management, common policies, common branding and public offerings, and common timekeeping and pay procedures." *Id.* ¶ 51. The Court finds these allegations, taken as true at this early stage of the litigation before

discovery, plausibly state the necessary sales volume for purposes of demonstrating coverage under the FLSA.[9]  Whether the restaurants actually receive more than $500,000 in annual gross sales is a fact question that may not be resolved under a Rule 12(b)(6) analysis.

Accordingly, the Court recommends that Judge Arguello find the Plaintiff has plausibly alleged he is a covered individual and the Defendants are a covered enterprise under the FLSA and deny the Defendants' motions in this regard.

## IV.    Are the Individual Defendants Liable under the Colorado Wage Claim Act?

The Colorado Wage Claim Act ("CWCA") defines an employer as, "every person, firm, partnership, association, corporation, migratory field labor contractor or crew leader, receiver, or other officer of court in Colorado, and any agent or officer thereof, of the above mentioned classes, employing any person in Colorado."  Colo. Rev. Stat. § 8–4–101(6).

The Colorado Supreme Court has held, "Upon review of the language, design, purpose, and construct of Colorado's Wage Claim Act, we conclude that the General Assembly did not intend to impose personal liability on *corporate* officers and agents for payment of earned, but unpaid, wages and other compensation the corporation owes to employees."  *Leonard v. McMorris*, 63 P.3d 323, 326 (Colo. 2003) (en banc) (emphasis added).  The issue in *Leonard* was whether "the General Assembly intended the Wage Claim Act's definition of 'employer' to supersede Colorado's otherwise applicable corporate law."  *Id.* at 330.  The court held that the definition did not change Colorado's corporate law principles holding an officer and/or agent of a corporation liable in their

---

[9]The Court finds this case distinguishable from that addressed in *Topp v. Lone Tree Athletic Club, Inc.*, No. 13-cv-01645-WYD-KLM, 2014 WL 3509201 (D. Colo. July 15, 2014), in which Senior Judge Daniel adopted Magistrate Judge Mix's finding that the plaintiff, who repeatedly listed only "formulaic recitations of the elements of an FLSA claim" in his complaint, failed to plausibly allege the defendant "athletic club" was an enterprise engaged in commerce.

representative capacity only and not individually.  *Id.*  Based on *Leonard*'s holding, a court in this district granted a motion to dismiss three corporate officers named as defendants for claims under the CWCA.  *Lester v. Gene Express, Inc.*, No. 09-cv-02648-REB, 2010 WL 3941417, at *5 (D. Colo. Sept. 27, 2010).

Here, the Entity Defendants include both corporations and limited liability companies ("LLCs").  An LLC in Colorado has been described as "offer[ing] members the limited liability protection of a corporation, together with the single-tier tax treatment of a partnership along with considerable flexibility in management and financing."  *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1000 (Colo. 1998) (en banc) (recognizing the General Assembly's "recent" adoption of the LLC Act).  Given *Leonard*'s holding that Colorado limits liability of corporate and LLC officers to their representative capacities only, the Court finds the CWCA claims against Garcia and Sanchez are subject to dismissal.

Plaintiff argues that opinions issued more recently than *Leonard* demonstrate individual liability may be found under certain circumstances, such as when an individual's conduct is found to be "intentional, unauthorized, and self-serving" or when a party successfully "pierces the corporate veil."  Resp. 12–13.  The Court is not convinced.  None of the cases cited by the Plaintiff involve claims under the CWCA, they generally follow law that was in effect before *Leonard* was issued, and they provide no basis on which this Court may find an exception to *Leonard*.  *See Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191–92 (Colo. App. 2008); *McCallum Family LLC v. Winger*, 221 P.3d 69, 74 (Colo. App. 2009).

The Court respectfully recommends that Judge Arguello grant the Defendants' motions to dismiss the Plaintiff's CWCA claims against Defendants Garcia and Sanchez.

32

## V.   Does the Plaintiff State Plausible Claims for Overtime Violations of the FLSA and CWCA?

Defendants contend the Plaintiff has failed to allege "that he worked more than forty hours in a given workweek without being compensated for the hours worked in excess of forty during the week." Mot. 12. Plaintiff counters that his allegations, taken as true and in context, demonstrate that he claims he was not properly compensated for hours worked more than forty in a given workweek. Defendants reply that Plaintiff does not identify a given workweek in which he worked more than forty hours pursuant to this Court's recommendation issued in *Martinez v. Xclusive Mgmt., LLC*, No. 15-cv-00047-MSK-MEH, 2015 WL 12734809, at *6 (D. Colo. Aug. 12, 2015), *adopted* (D. Colo. Oct. 8, 2015). In support of his overtime claim, Plaintiff alleges:

> 54. Plaintiff Fuentes worked for Tequila's Family Mexican Restaurant as a waiter/bartender from October 24, 2016 to February 22, 2017. He worked at the Thornton location for the first couple of months and then for about three months at the Golden location.
>
> ***
>
> 58. In regards to Plaintiff Fuentes' duties and responsibilities, in addition to waiting tables, he would perform "side work" tasks such as putting ice in the coke machine, making iced tea, cutting lemons, making sure the salt and pepper racks were stocked, making sure the tables were clean, making sure the floors were clean, writing down the lunch specials for the customers to see, and rolling silverware.
>
> ***
>
> 61. When he worked in Thornton, on average Plaintiff Fuentes estimates he worked 45 hours a week. In Golden, Plaintiff Fuentes estimates that he worked 55 hours a week for the first three weeks after the location first opened, and then about 45 hours a week.
>
> 62. Plaintiff Fuentes usually worked 6 days per week, every day of the week except Tuesday, almost always working both lunch and dinner shifts. Generally, he started work around 10:00 a.m. before the restaurants opened for customers at 10:45 a.m. (Golden) and 11:00 a.m. (Thornton).

33

63. Plaintiff Fuentes would clock out in the middle of the afternoon, for around 2-3 hours between around 2:00pm and 5:00pm.

64. The restaurants both close at 11:00 p.m. on Fridays and Saturdays and at 10:00 p.m. on the other days of the week. Plaintiff Fuentes would generally clock out right around closing time unless there were any guests remaining in his section. In such circumstances, he would clock out shortly after the last one left, which was approximately 20-30 minutes after the closing time.

65. For the biweekly pay period ending 12/31/2016, Plaintiff's paystub indicates that he worked more than 86 hours (in Golden). Thus, at least in one of the two weeks constituting that pay period he worked more than 40 hours a week.

66. Plaintiff Fuentes worked "off the clock" insofar as Defendants required him to perform work before clocking in and/or after clocking out. Specifically, Defendants regularly required Plaintiff Fuentes to clock out and then perform "side work" and cleaning activities. This would take about 20-30 minutes per day.

67. Defendants did not pay Plaintiff Fuentes for this time in wages, nor did he receive any tips related to this time.

68. For almost every shift he worked at Golden, his manager Alejandro required him to clock out and then perform cleaning activities. When he worked at Thornton, under a different manager, this would happen less frequently, but would still occur about 2-3 times per week.

69. While in this position, Plaintiff Fuentes' pay scheme was subminimum wage plus tips.

70. In 2016 (and the first pay period of 2017), his regular hourly rate was $5.28 per hour and his overtime rate was $7.92 per hour. Thereafter in 2017, his hourly wage rate was $6.28 per hour and the overtime rate was $9.14 per hour.

71. Thus, Plaintiff Fuentes was not paid at the correct rate for all hours over 40 worked in a workweek.

Am. Compl., ECF No. 63.

In *Martinez*, this Court concluded that "the Tenth Circuit would likely follow the First, Second, Third and Ninth Circuits' opinions that to state a plausible claim for overtime pay under the FLSA, a plaintiff must allege that he or she worked more than forty hours in a given workweek

without being compensated for the hours worked in excess of forty during that week." *Id.* at *6. In that case, the plaintiffs alleged generally that the defendants failed to pay them overtime premiums on a consistent basis through they worked more than forty hours per week, clocked out the plaintiffs for a meal break even when the plaintiffs worked during that time, and "often paid their hourly employees at their regular hourly rates for hours worked beyond forty in each workweek, rather than always pay overtime premiums to these employees." *Id.* at *2. The Court finds the allegations here substantially more specific than those alleged in *Martinez*, but the Defendants contend they are not specific "enough" to be plausible.

For instance, Defendants attach a copy of the paystub referenced by Plaintiff in the operative pleading at paragraph 65, arguing that it does not altogether reflect what the Plaintiff alleges and that the Court may consider the document because it is "central to the Plaintiff's claim." Mot. 13. Even if the Court were to consider the document, however, the Court finds the Plaintiff's allegations, taken as true and in context, are sufficient to show a plausible claim for overtime under *Martinez*.

To satisfy the holding in *Martinez*, this Court concluded,

the Plaintiffs need only "draw on their own 'memory and experience' to ... recall basic facts about [their] own work experience, such as when [they] worked overtime; whether [they] came to work early, stayed late, or took on additional shifts; approximately how many extra hours [they] worked per week; and the types of tasks [they] performed during [their] overtime hours." *Perkins* [*v. 199 SEIU United Healthcare Workers East*, 73 F. Supp. 3d 278, 290 (S.D.N.Y. 2014)]. In other words, the Plaintiffs need allege only "both an estimate of the hours worked and a general idea of the type of work performed." See *Perez* [*v. Prime Steak House Rest. Corp.*, 939 F. Supp. 2d 132, 141–42 (D. P.R. 2013).].

*Id.* at *6; *see also Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 243 (3d Cir. 2014) ("a plaintiff's claim that she 'typically' worked forty hours per week, worked extra hours during such a forty–hour week, and was not compensated for extra hours beyond forty hours he or she worked during one or

more of *those* forty–hour weeks, would suffice."); *Nakahata v. New York–Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013) ("These allegations—that Plaintiffs were not compensated for work performed during meal breaks, before and after shifts, or during required trainings—raise the possibility that Plaintiffs were undercompensated in violation of the FLSA and NYLL; however, absent any allegation that Plaintiffs were scheduled to work forty hours in a given week, these allegations do not state a plausible claim for such relief. To plead a plausible FLSA overtime claim, Plaintiffs must provide sufficient detail about the length and frequency of their unpaid work to support a reasonable inference that they worked more than forty hours in a given week.").

Here, notwithstanding paragraph 65 and taking Plaintiff's other allegations as true, the Plaintiff worked in Thornton for two months from October to December 2016, then in Golden for two[10] months from December 2016 to February 2017 as a server/waiter; during the two months in Thornton, he worked approximately forty-five hours per week, and during the two months in Golden, he worked fifty-five hours per week for the first three weeks, then forty-five hours per week thereafter; he worked six days per week from 10:00 a.m. to 2:00 p.m., then from 5:00 p.m. to 10:00 p.m. or 11:00 p.m., depending on the day of the week; before he clocked in and after he clocked out, he was required to perform work-related duties, including cleaning and stocking; in 2016 and the first pay period of 2017, Plaintiff's regular hourly rate was $5.28 per hour and his overtime rate was $7.92 per hour; thereafter in 2017, his hourly wage rate was $6.28 per hour and the overtime rate was $9.14 per hour; and Plaintiff was not paid at the correct rate for all hours over 40 worked in a

---

[10]The allegation actually states that Plaintiff worked for "three" months during this period, but the Court concludes it must be a typographical error.

workweek.  The Court finds these allegations are sufficient to demonstrate not only that Plaintiff has

"identified" given workweeks in which he worked more than forty hours, but also "when [Plaintiff]

worked overtime; whether [Plaintiff] came to work early, stayed late, or took on additional shifts;

approximately how many extra hours [Plaintiff] worked per week; and the types of tasks [Plaintiff]

performed during [his] overtime hours," or in other words, "both an estimate of the hours worked

and a general idea of the type of work performed."  *Martinez*, 2015 WL 12734809 at *6 (citing

*Perkins*, 73 F. Supp. 3d at 290).

The Court respectfully recommends that Judge Arguello find Plaintiff states plausible claims

for overtime under the FLSA and CWCA[11] and deny the Defendants' motions to dismiss.

## VI.      Does Plaintiff State Plausible Claims for Defendants' Improper Retention of Tips?

Defendants argue that Plaintiff "provides no legal authority to demonstrate how

management's alleged mishandling of tips violated the FLSA and cannot state a cause of action

based on this conclusory allegation."  Mot. 14.  Plaintiff counters that his allegations concerning the

Defendants' improper retention of tips simply constitute a factual scenario by which he brings his

claim for minimum wages.  The Court agrees that such scenario is proper.  In *Koellhoffer*, Senior

Judge Daniel found that while an employer may take a "tip credit" against the minimum wage

required to be paid to its employees, the employees must retain all tips he or she receives and the

employer may not share in any tip pool.  858 F. Supp. 2d at 1189.

---

[11]*See Irigoyen–Morales v. Concreations of Colo., Inc.*, No. 15–cv–02272–LTB–KLM, 2016 WL 8346054 (D. Colo. June 30, 2016) ("the CWCA supports a claim for overtime pay owed under the FLSA.").  Also, Defendants rely on the same arguments in support of their requests to dismiss the FLSA and CWCA overtime claims.  Mot. 15.

Plaintiff alleges that his hourly wage rates were $5.28 in 2016 and $6.28 in 2017[12]; he and others similarly situated were never informed about or provided with notice of any tip credit claimed by the Defendants; customers would regularly leave tips on credit cards, but tips were only paid to servers in cash at the end of the shift, not in paychecks; on the pay stubs, all the tips were reported as cash tips; while in Golden, Plaintiff realized that the tips reported on his paystub were more than he actually received; and Plaintiff believes management retained tips intended for Plaintiff and others similarly situated.  Am. Compl. ¶¶ 70, 72–75.  The Court finds these allegations are proper to support the Plaintiff's minimum wage claim (*see id.* ¶¶ 92–95) and recommends that Judge Arguello deny the Defendants' motions in this regard.

## VII.    Does the Plaintiff State Plausible Claims for Defendants' Record-Keeping Failures?

Defendants contend that the "FLSA does not create a private cause of action to enforce FLSA recordkeeping [sic] requirements" and, thus, any such claim by the Plaintiff must be dismissed.  Mot. 15.  Plaintiff counters that he has not requested separate damages for any record-keeping failures and explains that his allegations are included to "elucidate . . . Defendants' willfulness."  Resp. 18.

Defendants do not dispute Plaintiff's contention that he does not seek damages for any alleged record-keeping failures, and the Court agrees that the Second Amended Complaint lists none.  Accordingly, the Court finds Plaintiff's allegations in this regard do not allege a separate claim for damages and, thus, no "dismissal" is required.  The Court recommends that Judge Arguello deny the Defendants' motions in this regard.

---

[12]The federal minimum wage during this period was $7.25.  *See* https://www.dol.gov/general/topic/wages/minimumwage, last visited December 6, 2017.

## CONCLUSION

The Court concludes the Defendants are correct that the Plaintiff's claims pursuant to the CWCA against the individual Defendants must be dismissed.  However, Defendants have failed to demonstrate the Court must dismiss the operative pleading for lack of subject matter jurisdiction, and they do not persuade the Court at this stage of the litigation that Plaintiff failed to plausibly allege an employment relationship between Plaintiff and the Defendants, individual and enterprise coverage under the FLSA, and overtime violations under the FLSA and CWCA.  Moreover, the Plaintiff's allegations concerning "improper retention of tips" are intended to support his minimum wage claims and the allegations regarding alleged record-keeping failures are intended to support an assertion of willfulness; neither is intended to state a separate claim for damages and, thus, dismissal is unnecessary.

THEREFORE, based on the entire record and for the reasons stated above, the Court respectfully recommends that the Tequila's Defendants' Motion to Dismiss Second Amended Complaint [filed September 29, 2017; ECF No. 80] and the Tequileno Defendants' Motion to Dismiss Second Amended Complaint [filed September 29, 2017; ECF No. 81] be **granted in part and denied in part** as set forth herein.[13]

---

[13]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations.  *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1).  Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual and legal findings of the Magistrate Judge that are

Respectfully submitted at Denver, Colorado, this 12th day of December, 2017.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

---

accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir.1991)).